UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WADE L. HESS,                 : CIVIL NO: **1:CV-03-2396**
                  Plaintiff  :
                             : (Judge Kane)
        v.                   :
                             : (Magistrate Judge Smyser)
GALE SMYERS,                  :
MARK D. FETTERMAN,            :
YORK COUNTY ADULT PROBATION   :
DEPARTMENT,                   :
YORK COUNTY PUBLIC DEFENDER   :
OFFICE,                       :
YORK COUNTY CLERK OF COURTS,  :
and YORK COUNTY,              :
                  Defendants :

## REPORT AND RECOMMENDATION

### I. Background and Procedural History.

The plaintiff, a prisoner proceeding *pro se*, commenced this 42 U.S.C. § 1983 action by filing a complaint on December 29, 2003.

The complaint names as defendants: 1) John H. Chronister, the President Judge of the Court of Common Pleas of York County; 2) Gale Smyers, a York County Probation and Parole Officer; 3) Mark D. Fetterman, an Assistant District Attorney in Lancaster County; 4) the Lancaster County District Attorney's Office; 5) Lancaster County; 6) the York

County Adult Probation Department; 7) the York County Public Defender's Office; 8) the York County Clerk of Courts; and 9) York County.

The plaintiff alleges the following facts in his complaint.  On December 8, 1999, the plaintiff pled guilty to one count of Driving Under the Influence before Judge Chronister. *Complaint* at ¶20.  The plaintiff was sentenced to 7 days of work release and fifteen days of house arrest to one year imprisonment. *Id.*  The plaintiff reported to the York County Prison on January 3, 2000, served his seven days on work release and was paroled on January 9, 2000. *Id.* at ¶21.  The plaintiff served his fifteen days of house arrest from January 12, 2000 to January 27, 2000. *Id.*

On August 4, 2000, the plaintiff was arrested for a new charge in Lancaster County. *Id.* at ¶22.  The plaintiff posted bail on August 8, 2000 but was not released due to a temporary detainer placed on the plaintiff by the York County Adult Probation Department. *Id.* at ¶23.  On August 10, 2000, Judge Chronister signed and issued a permanent detainer. *Id.*

The plaintiff alleges that on January 3, 2001, the maximum sentence imposed on the DUI charge in York County expired.  He contends that, at that point, York County authorities no longer had personal jurisdiction over him. *Id.* at ¶24.  He asserts that at that point Judge Chronister and defendant Smyers were required by Pennsylvania law to remove

2

the detainer lodged against him. *Id.*

The plaintiff was granted ROR bail on his Lancaster
County charge on February 13, 2001 but was kept imprisoned
because of the York County detainer which the plaintiff
contends was invalid. *Id.* at ¶25.

On March 8, 2001, defendant Fetterman telephoned
defendant Smyers and requested Smyers to keep the plaintiff
incarcerated until the plaintiff was tried on the Lancaster
County charge. *Id.* at ¶26.  The plaintiff alleges that the
March 8, 2001 telephone call to defendant Smyers from
defendant Fetterman "can only be construed as an attempt to
unlawfully prejudice the plaintiff's defense and circumvent
Pennsylvania law, thereby violating the plaintiff's
Constitutional rights, privileges and immunities, causing
sever[e] grievous damage while keeping the plaintiff falsely
imprisoned when neither Lancaster County nor York County had
any legal basis to do so." *Id.*

On March 9, 2001, a witness for the plaintiff telephoned
defendant Smyers and Smyers told the witness that the
Lancaster County Assistant District Attorney had called him
the day before, that he was going to talk to the judge and
that the plaintiff would not be released until he was tried
on the Lancaster County charge. *Id.* at ¶27.  The plaintiff
alleges that there was a conspiracy between defendants
Chronister, Smyers and Fetterman and that an agreement was

3

made to keep the plaintiff incarcerated and to allow no litigation in the plaintiff's case. *Id.* at ¶28.  The plaintiff alleges that he never received a written notice of why the running of his parole term was interrupted, that he was not advised of any procedural rights, that he was not given the opportunity to be heard in person or to confront any witnesses against him, that there is no record of any written statement by a fact finder establishing probable cause for the plaintiff's detention, and that it was never determined that he had violated his parole. *Id.*

On March 13, 2001, the plaintiff was transferred to the York County Prison. *Id.* at ¶29.

The plaintiff hired an attorney on March 17, 2001 but that attorney was not able to achieve the plaintiff's release or to cause any other action to be taken. *Id.* at ¶30.  The plaintiff wrote to defendant Smyers on April 16, 2001, April 27, 2001 and May 8, 2001 and left a message on Smyers' voice mail on April 19, 2001. *Id.* at ¶31.  On May 12, 2001, Smyers returned one of the plaintiff's letters to him. *Id.* at ¶33. The returned letter had four handwritten notes from defendant Smyers. *Id.*  Those notes are the only communication the plaintiff received from defendant Smyers.  The plaintiff never met or talked to defendant Smyers, who was his assigned parole officer. *Id.*  One of the handwritten notes from Smyers stated: "Policy with sever[e] new offenses, we detain." *Id.*

On June 13, 2001, plaintiff's counsel filed a petition for a writ of habeas corpus, which petition was denied by Judge Chronister. *Id.* at ¶34.  The plaintiff alleges that he did not receive a copy of the Order denying his habeas petition in sufficient time to file an appeal. *Id.*

Having no more funds to pay attorney's fees, on July 24, 2001, the plaintiff sought assistance from the public defender's office. *Id.* at ¶37.  On December 21, 2001, the plaintiff was told by the liason of the public defender's office that Judge Chronister had told the public defender's office that they could not assist him. *Id.* at ¶41.

On December 28, 2001, the plaintiff sent a *pro se* habeas corpus petition to the York County Clerk of Courts. *Id.* at ¶42.  The Clerk did not docket the petition due to an official policy of the Clerk to accept motions only when filed by the last named attorney of record. *Id.*

On January 2, 2002, Judge Chronister signed an order lifting the detainer effective January 22, 2002. *Id.* at ¶43. The plaintiff was released on January 22, 2002, after having served a total of two years and 19 days and having never been found to have violated his parole. *Id.*

On January 18, 2002, the plaintiff filed another *pro se* habeas petition with the York County Clerk of Courts, which petition was docketed on January 23, 2002. *Id.* at 44.  The

5

plaintiff alleges that no action was ever taken on this petition. *Id.*

The plaintiff appealed Judge Chronister's January 2, 2002 order to the Pennsylvania Superior Court. *Id.* at ¶45. The Superior Court dismissed the appeal as moot on July 11, 2002. *Id.*

The plaintiff alleges that his incarceration prejudiced his ability to defend himself on the Lancaster County charge. *Id.* at ¶46.  He alleges that while he was incarcerated in the York County Prison he was unknowingly forced to waive his right to a speedy trial on the Lancaster County charge and that he lost contact with four critical defense witnesses. *Id.*

The plaintiff alleges that as a result of the defendants' acts he lost his employment, his home was foreclosed on and taken, his credit record was damaged, and he was forced into default on all contracts to which he was a party. *Id.* at ¶47.

The plaintiff claims that defendants Chronister, Smyers and Fetterman conspired to intentionally deprive him of his right to be free of unreasonable seizure by seizing him in violation of the Fourth and Fourteenth Amendments. *Id.* at ¶48.  He further claims that these defendants intentionally conspired to falsely imprison him in the York County Prison

6

from March 13, 2001 until January 22, 2002 without substantive or procedural due process in violation of the Fourth and Fourteenth Amendments. *Id.* at ¶48.  He also claims that these defendants, with deliberate indifference or gross negligence, failed to rescue him in violation of the Eighth and Fourteenth Amendments. *Id.*  He also claims that the objectives of the conspiracy between these defendants was to injure, harm and deprive him of his rights with respect to the outstanding Lancaster County charge and that these defendants did injure, harm and deprive him of his rights in violation of the Fourth, Sixth and Fourteenth Amendments. *Id.* at ¶48.   The plaintiff further claims that defendants Chronister, Smyers and Fetterman also committed common law torts of malicious prosecution and abuse of process. *Id.* at ¶¶11-13.

The plaintiff claims that defendants Lancaster County and Lancaster County District Attorney's Office, with deliberate indifference or reckless disregard, established official policies, customs and usages that deprived him of his right to be free from unreasonable seizure and false imprisonment. *Id.* at ¶48.  He claims that these defendants violated his rights "by means of an established custom of employing maladapted adversarial strategies designed to unfairly constrain and prejudice pretrial detainees." *Id.* The plaintiff claims that these defendants caused him to be imprisoned from February 13, 2001 to March 13, 2001 on an invalid detainer, and that they caused him to be held by York

County Authorities and deprived of his right to be free from unreasonable seizure and false imprisonment in violation of the Fourth, Eighth and Fourteenth Amendments. *Id.*

The plaintiff claims that the York County Adult Probation Department violated the Eighth and Fourteenth Amendments by failing to rescue him and by establishing an official policy that unreasonably seized and falsely imprisoned him without establishing probable cause and without substantive or procedural due process in violation of the Fourth and Fourteenth Amendments. *Id.* at ¶16.

The plaintiff further claims that defendants Chronister, York County Public Defender's Office, York County Clerk of Courts and York County denied him access to the courts from March 13, 2001 to January 22, 2002 in violation of the First Amendment. *Id.* at ¶48.

The plaintiff is seeking compensatory damages from all of the defendants as well as injunctive relief ordering the defendants to take all actions necessary to have him reinstated at his previous employment.  From defendants Chronister, Smyers and Fetterman, the plaintiff is also seeking punitive damages.

By Order of January 19, 2005, the claims against defendant Chronister were dismissed on the basis of judicial immunity.

By Order of February 28, 2005, motions by the York
County defendants and the Lancaster County defendants to
dismiss the complaint were denied.  Answers to the complaint
by all remaining defendants were filed on June 2, 2005.

By a stipulation dated December 8, 2005, the plaintiff's
complaint was dismissed as to defendants Lancaster County,
Lancaster County District Attorney's Office and Donald R.
Totaro.

The defendants filed motions for summary judgment and
filed LR 56.1 statements of undisputed material facts and
supporting briefs.  Docs. 94-98.  The plaintiff filed
responses and opposing briefs.  Docs. 100-106.  Reply briefs
were not filed.  The motions for summary judgment are ripe
for decision, and for the reasons stated in this Report and
Recommendation it will be recommended that the defendants'
motions be granted.

II.  The Summary Judgment Undisputed Facts.

From the pleadings and the LR 56.1 statements of
undisputed facts, it is established that the following facts
are not in dispute:

On December 8, 1999, the plaintiff pled guilty to
driving under the influence before Judge Chronister in York
County.  He was sentenced to a sentence of from 22 days to

one year.  He served seven days on work release and fifteen
days on house arrest, and was paroled by Judge Chronister on
January 9, 2000.  At that point there was a balance of 343
days left to serve on his sentence.  On May 4, 2000, while on
parole, he was arrested in Lancaster County for driving under
the influence of alcohol, driving despite a suspended or
revoked operating privilege, and possession of marijuana and
of drug paraphernalia.  He was released on May 4, 2000 on
conditions of release upon these charges.

On July 3, 2000, after a preliminary hearing, the
Lancaster County DUI and drug charges (the May 4, 2000
charges) were bound over for trial.  The plaintiff remained
under conditions of release until, on August 3, 2000, he was
arrested and charged in Lancaster County for arson, criminal
trespass and criminal conspiracy.  He remained in Lancaster
County custody after an August 4, 2000 preliminary
arraignment and the setting of bail in an amount that he did
not meet.

On August 10, 2000, acting upon a request from York
County Probation Officer Matt Brophy for an order directing
that a 72 hour detainer be lodged at the Lancaster County
Prison, York County Judge Chronister ordered that a detainer
be lodged at the Lancaster County Prison by York County
authorities, requiring that plaintiff Hess be detained on the
basis of a possible violation of his York County parole in
the form of a commission of a new criminal violation while on

10

parole.  Judge Chronister's detainer order directed that Hess
be detained "until such time as the prisoner can be disposed
of by law."

On September 18, 2000, Hess pled guilty in the Lancaster
County Court of Common Pleas to charges arising from the May
4, 2004 (DUI) arrest.  He was sentenced to serve a term of
three to twenty-three months in the Lancaster County Prison.
On November 2, 2000, a preliminary hearing was held in
Lancaster County as to the August 3, 2000 arson and related
charges.  These charges were held over for trial in the
Lancaster County Court of Common Pleas.

On February 13, 2001, having been paroled by the
Lancaster County Court upon the September 18, 2000 sentence,
and having posted bail as to the August 3, 2000 arson and
related charges, Hess had achieved and was legally entitled
to a conditional release from custody (on parole and on bail)
insofar as the Lancaster County charges and proceedings were
concerned.  The York County (Judge Chronister's) detainer
however remained in force and effect and prevented Hess'
release.  Even so, York County did not take custody of Hess
on February 13, 2001.  From February 13, 2001 on, his
continuing prison custody (until January 22, 2002) was on the
basis of the York County detainer entered on August 10, 2000.
On March 13, 2001, he was transferred from the Lancaster
County Prison to the York County Prison, but did not have a
hearing and had not received a statement of alleged

violations of his York County Parole.

On June 14, 2001, Hess through his attorney asked Judge
Chronister by way of a habeas corpus petition to end Hess'
prison custody based on the detainer, contending that Hess'
detention for an indefinite and continuing term without
process was in violation of Pennsylvania law.  Judge
Chronister denied the petition, on June 14, 2001, stating
that "the Court can not determine whether a violation has
occurred, or the appropriate disposition until the new
charges are resolved."

On July 2, 2001, defendant York County Probation Officer
Smyers requested in a memorandum to Judge Chronister that
"the permanent detainer be cancelled and removed effective
July 13, 2001."

On August 10, 2001, Hess by his attorney asked Judge
Chronister to remove the York County detainer pending the
disposition of the arson case in Lancaster County.  Judge
Chronister replied to the request by stating that Hess'
Lancaster County custody was attributable to the York County
detainer from February 13, 2001 forward, but not before that
date.  Judge Chronister stated that he would not consider
Hess for release until the time for Hess' release on nominal
bail as to the Lancaster County charges had become equal to
the unserved time of 343 days on Hess' York County sentence
on which he had been paroled on January 9, 2000.  Defendant

12

Smyers, following Judge Chronister's directions, informed
Judge Chronister on December 21, 2001 that the York County
Probation Office had, as of December 21, 2001, served his
full one year York County sentence.  On December 27, 2001,
defendant Smyers informed Judge Chronister, however, that the
expiration date would occur on January 22, 2002.  Judge
Chronister entered an order directing that Hess be released
on January 22, 2002 and that the York County case thereupon
be closed.

III.  Discussion.

    Summary judgment is appropriate if the "pleadings,
depositions, answers to interrogatories, and admissions on
file, together with the affidavits, if any, show that there
is no genuine issue as to any material fact and that the
moving party is entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(c).  "The moving party bears the initial
burden of demonstrating the absence of any genuine issue of
material fact, though the non-moving party must make a
showing sufficient to establish the existence of each element
of his case on which he will bear the burden of proof at
trial." *Huang v. BP Amoco Corp.*, 271 F.3d 560, 564 (3d Cir.
2001); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

    "A factual dispute is material if it bears on an
essential element of the plaintiff's claim, and is genuine if
a reasonable jury could find in favor of the nonmoving

13

party." *Natale v. Camden County Correctional Facility*, 318 F.3d 575, 580 (3d Cir. 2003). In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988). "Our function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Federal Home Loan Mortgage Corp. v. Scottsdale Ins. Co.*, 316 F.3d 431, 443 (3d Cir. 2003).

Defendant Fetterman, an Assistant District Attorney of Lancaster County, argues that summary judgment should be granted in his favor because a parole revocation hearing does not have to be held at a certain time. Alternatively, he argues, he is entitled to qualified immunity.

The York County defendants argue for summary judgment on the grounds that the plaintiff's civil rights action is the functional equivalent of an appeal from the state court decision to deny plaintiff Hess' June 14, 2001 habeas corpus petition, which was denied by Judge Chronister. Thus, they argue, since Judge Chronister's denial of the petition was not appealed, this action in essence asks this court to decide an issue of law already decided by a final order of the state court in a manner at odds with the decision of the state court, in contradiction of the *Rooker-Feldman* doctrine. The York County defendants also assert that they are entitled

14

to qualified immunity.

The plaintiff's claim that his federally protected rights were violated is based on the fact that he was not given a hearing and was therefore not given any chance to be released, on the basis of a determination that probable cause was not presented to support the allegation of a violation of the conditions of his parole release.  He was not even given notice of the alleged violation(s).  It is also based upon the use of a detainer as the sole process used by York County to effect a parolee's detention and the effective revocation of a 343 day parole without any other process.

The plaintiff's challenge to the procedure that was used in his case as a violation of his federally protected rights, his right to procedural due process, clearly has merit.  The case involves in part a use of a detainer by one state jurisdiction, York County, for a purpose beyond that of requesting another state jurisdiction, Lancaster County, where the prisoner is in custody, to hold the prisoner at the expiration of Lancaster County's justification for having custody so that York County could then take custody.  It also involves in part the use of a detainer to hold a parolee in continuous custody on the basis of new criminal charges against the parolee without affording the parolee any hearing at all on the issues that could have been addressed at an initial hearing on a potential parole revocation.  Here, the jurisdiction that lodged the detainer, York County, after

15

notice of the prisoner's (the plaintiff's) availability, used its detainer as the basis for a continued confinement of the prisoner without any underlying order or process, and Lancaster County consented to and complied with that use of the detainer.  There is merit in the plaintiff's assertion that it was a violation of his right to due process for the state to cause him to be subject to continual confinement without any hearing or process.

In *Morrissey v. Brewer*, 408 U.S. 471 (1971), the Court held it to be a requirement of due process in the context of a parole violation charge that promptly after a parolee's arrest on a parole violation charge there be held a hearing in the nature of a preliminary hearing to determine whether there is probable cause to believe that there has been a violation of a condition of parole committed by the parolee. Before the preliminary hearing there must be notice given to the parolee of the alleged parole violation.  408 U.S. at 485-487.  The plaintiff here, who was arrested in Lancaster County and who was in custody pursuant to process arising from new criminal charges from Lancaster County until he was released from Lancaster County pretrial custody on bail conditions on February 13, 2001, was not afforded notice of the parole violation charges against him or a hearing. Instead, he was maintained in Lancaster County Prison under the Order to Detain issued from York County on August 10, 2000.  From the date of the release from Lancaster County pretrial confinement on February 13, 2001 until his release

16

from the York County detainer on January 22, 2002, the
plaintiff remained in the Lancaster County Prison and then
(after March 13, 2001) the York County Prison because of the
York County detainer without any process in the York County
parole violation matter.

       One argument of defendant Fetterman is that a parole
revocation hearing does not have to be held at a certain
time.  It is asserted that *Morrissey* does not establish when
the probable cause hearing to determine whether a basis is
presented to hold a parole violation case over for a
revocation hearing must take place.   *Morrissey* holds that
the probable cause hearing must be held promptly.  408 U.S.
at 485.  In focusing on the timing of the revocation hearing,
the defendant does not address the right to notice of the
alleged violation and the right to a prompt probable cause
hearing.  The issue whether, when the parole violation is
based upon allegations of new criminal conduct, the parole
revocation authority may always wait until the criminal trial
on the new criminal charges has been held to conduct a
revocation hearing, is not a dispositive issue that is
presented here.  Even assuming that the revocation hearing
may always await the completion of the trial, that does not
justify the omission of a prompt probable cause hearing.
Furthermore, here there had in fact been a disposition of one
set of new criminal charges and still no revocation
proceedings were initiated.

17

It appears to be rather clear that rights of the plaintiff under *Morrisey v. Brewer* were violated.  *See*, *also*, *Gagnon v. Scarpelli*, 411 U.S. 778 (1973).

The defendants contend that they are entitled to qualified immunity and that the *Rooker-Feldman* doctrine requires that this court not address the issue of the plaintiff's continued detention.

We will consider again the *Rooker-Feldman* argument, which was considered in the Order of February 28, 2005, here in the context of and with reference to the state court order of June 14, 2001.  The *Rooker-Feldman* doctrine embodies the principles set forth in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).  Section 1257 of Title 28 of the United States Code confers on the United States Supreme Court appellate jurisdiction to review final judgments of the states' highest courts.  The *Rooker-Feldman* doctrine is the doctrine that, by negative implication, inferior federal courts lack subject matter jurisdiction to review final judgments of the states' highest courts. *E.B. v. Verniero*, 119 F.3d 1077, 1090 (3d Cir. 1997).  The *Rooker-Feldman* doctrine has been interpreted to also apply to final decisions of lower state courts. *Id*.  "District courts lack subject matter jurisdiction once a state court has adjudicated an issue because Congress has conferred only original jurisdiction, not appellate jurisdiction, on the

18

district courts." *In re Gen. Motors Corp. Products Liability Litigation*, 134 F.3d 133, 143 (3d Cir. 1998).  The existence of a state court judgment in another case bars a subsequent federal proceeding under *Rooker-Feldman* "when entertaining the federal court claim would be the equivalent of an appellate review of that order." *FOCUS v. Allegheny County Court of Common Pleas*, 75 F.3d 834, 840 (3d Cir.  1996). "Under the *Rooker-Feldman* doctrine, lower federal courts cannot entertain constitutional claims that have been previously adjudicated in state court or that are inextricably intertwined with a state adjudication." *Whiteford v. Reed*, 155 F.3d 671, 673-74 (3d Cir. 1998).  In other words:

> *Rooker-Feldman* precludes a federal action if the relief requested in the federal action would effectively reverse the state decision or void its ruling.  Accordingly, to determine whether *Rooker-Feldman* bars [a] federal suit requires determining exactly what the state court held . . .  If the relief requested in the federal action requires determining that the state court's decision is wrong or would void the state court's ruling, then the issues are inextricably intertwined and the district court has no subject matter jurisdiction to hear the suit.

*Whiteford*, *supra*, 155 F.3d at 674 (quoting *FOCUS, supra*, 75 F.3d at 849).  "The fundamental and appropriate question to ask is whether the injury alleged by the federal plaintiff resulted from the state court judgment itself or is distinct from that judgment."  *Young v. Murphy*, 90 F.3d 1225, 1231 (7th Cir. 1996)(quoting *Garry v. Geils,* 82 F.3d 1362, 1365 (7th Cir. 1996)).

19

The *Rooker-Feldman* doctrine is not applicable as to the June 14, 2001 denial of a petition for a writ of habeas corpus.  That decision addressed only an issue under Rule 708 of the Pennsylvania Rules of Civil Procedure.  It did not address the federal constitutional issues that are raised in this 42 U.S.C. § 1983 civil action.

We will turn to the defendants' qualified immunity arguments.

"The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer,* 122 S.Ct. 2508, 2513 (2002).  Despite their participation in constitutionally impermissible conduct, government officials "may nevertheless be shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 2515 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Qualified immunity operates to ensure that, before they are subjected to suit, officers are on notice that their conduct is unlawful. *Id.*  "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow, supra*, 457 U.S. at 818-19.

20

To be clearly established the contours of the right must be sufficiently clear that a reasonable official would understand that his actions violate that right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The inquiry into reasonableness should be examined in light of clearly established law and the information the official possesses. *Id.* The defendant's subjective beliefs are irrelevant. *Id.* at 641.

"The 'chronic difficulty' in applying the test for qualified immunity is defining the right at issue in a manner that is neither too broad (thereby exposing officials to numerous suits based on violations of abstract rights) nor too narrow (thereby insulating nearly all discretionary decisions from liability)." *Warren v. Keane*, 196 F.3d 330, 332 (2nd Cir. 1999). In order for the law to be clearly established it is not necessary that the very action in question was previously held unlawful. *Hope, supra,* 122 S.Ct. at 2516. Officials can still be on notice that their conduct violates established law even in novel situations. *Id.* The salient question is whether the state of the law at the time gave the officials fair warning that their alleged conduct was unconstitutional. *Id.*

The right to a prompt probable cause hearing for a person in custody on the basis of a charge that the person has violated a condition of the person's parole is a clearly established right. The state of the law since the decision

of the Supreme Court of the United States in *Morrissey v. Brewer* has given fair notice to officials that a probable cause hearing must be promptly held.

The summary judgment facts permit an analysis of the applicability of qualified immunity to the conduct of York County and Lancaster County defendants that was not possible as to the earlier motions to dismiss.  It is apparent on the summary judgment record that the basis for the plaintiff's custody from August 10, 2000 to January 22, 2002 was Judge Chronister's order.  The York County defendants and defendant Fetterman had no authority to act in contradiction of Judge Chronister's order to cause the plaintiff to be released in this time period.  In this context, although the plaintiff had a right to process that he did not receive, there is not any basis for a finding that any York County or Lancaster County defendant violated clearly established rights of the defendant.  No actionable omission or commission by any defendant is identifiable.  We conclude, therefore, that qualified immunity compels that summary judgment be granted for the remaining defendants.

The defendants have also raised arguments that are generally based upon the doctrine of quasi-judicial immunity. The court in the Order of February 28, 2005 (Doc. 34), adopting a Report and Recommendation, had rejected a quasi-judicial immunity argument made by defendant Fetterman in the context of the earlier motion to dismiss the complaint.  The

defendants argue in presenting their quasi-judicial immunity argument here in this summary judgment context that they were not independent decision makers and actors as to the continued prison custody of the plaintiff without a parole revocation preliminary hearing or a parole revocation final hearing, but were rather ministerial actors acting pursuant to a state court order.

In *Gallas v. Supreme Court of Pennsylvania*, 211 F. 3d 760, 772-773 (3d Cir. 2000), the Court held that a deputy court administrator who had acted pursuant to a court order or directive was entitled to absolute quasi-judicial immunity.  Here, defendants Smyers is entitled similarly to absolute quasi-judicial immunity on that basis.  The plaintiff's detention, and the absence of a hearing or any form of process as to the parole violation charges or grounds for the detainer, was entirely based upon and caused by a judicial order.

The challenged custody of the plaintiff from August 10, 2000 to January 22, 2002 was either on the basis of arrests made in Lancaster County or the orders (detainers) of the York County Court.  The fact that there were conversations between the Office of the District Attorney of Lancaster County, the Adult Probation Office of York County and other public officers and offices concerning Hess during this time period, even assuming that the conversations involved defeating efforts on Hess' part to be released from custody,

23

is not a material fact in the analysis of the question
whether, given that the plaintiff's custody was at all times
the result of a determination by the York County Court that
the plaintiff should be detained until the disposition of the
pending Lancaster County charges, the defendants are
unexposed to liability for a violation of the constitutional
rights of the plaintiff by reason of quasi-judicial immunity.

    The summary judgment record establishes that the basis
for the plaintiff's claim against defendant Fetterman is that
Fetterman was advised by defendant Smyers that York County
(i.e., Judge Chronister) would keep its detainer in place to
prevent Hess' release until "July 2001 at the latest". (Doc.
102, p.11).  The plaintiff makes a number of assertions about
the conduct of defendant Fetterman, it is to be acknowledged,
we conclude that the one viable theory of a violation of the
plaintiff's federally protected rights that is presented in
all of the plaintiff's allegations is that the plaintiff was
wrongfully held in custody for an extended period of time on
the basis of the detainer ordered by the Court of Common
Pleas of York County, without notice of the charges and
without a hearing.  We have concluded that both qualified
immunity and quasi-judicial immunity are applicable to
defendant Smyers and the other York County defendants.  Given
that defendant Fetterman was another county's prosecutor, a
court may see the umbrella of quasi-judicial immunity
standing in York County not to extend over Fetterman in

Lancaster County.  As stated above, summary judgment should be granted in favor of defendant Fetterman on the basis of qualified immunity.

Accordingly, it is recommended that the defendants' motions for summary judgment be granted and that the Clerk be directed to enter judgment in favor of the defendants and to close the file.

_/s/ J. Andrew Smyser_
J. Andrew Smyser
Magistrate Judge

Dated:  March 24, 2006.

25